**UNITED STATES DISTRICT COURT**
**NORTHERN DISTRICT OF ILLINOIS**
**EASTERN DIVISION**

| | |
|---|---|
| ANDREI TOMESCU, individually and on behalf of all those similarly situated, | ) ) ) |
| Plaintiff, | ) ) **Civil Action No.** 26-CV-3709 |
| v. | ) **Class Action** ) **Jury Trial Demanded** |
| SIETE BUCKS SPIRITS, LLC, | ) ) ) |
| Defendant. | ) |

---

**CLASS ACTION COMPLAINT**

---

Plaintiff Andrei Tomescu, on behalf of himself and all those similarly situated, brings this Class Action Complaint against, alleging as follows:

**INTRODUCTORY STATEMENT**

1. This is a consumer class action arising from the marketing, labeling, and sale of tequila products represented as "100% agave," "hand crafted" and "small batch." Plaintiff Andrei Tomescu brings this action on behalf of himself and others similarly situated against Defendant Siete Bucks Spirits, LLC. ("Siete").

2. Siete markets and distributes the premium tequila brand *Teremana*, throughout Illinois and the United States.

3. This action is arising from the deceptive, unfair and misleading promotion of Teremana products in the state of Illinois and throughout the United States.

4. Siete represents on product labels, third-party websites, and marketing

materials that these products are made from "100% agave" or "100% Blue Weber agave".

5. These representations convey to reasonable consumers that the alcohol content of the products is derived solely from fermented sugars of the Blue Weber agave, and that the product complies with applicable regulatory requirements associated with "100% agave" tequila, including the expectation that no non-agave sugars and no undisclosed additives are used to influence the character, flavor, or composition of the tequila.

6. Also, Siete represents on product labels, third-party websites, and marketing materials that Teremana tequila "handcrafted" and it is made in "small batch."

7. "Small batch" on a tequila label signals craftsmanship, suggesting careful, hands-on production rather than mass manufacturing. It conveys higher perceived quality, leading consumers to expect better ingredients and flavor control. The term also implies scarcity, creating a sense of limited availability and exclusivity. It reinforces authenticity, associating the brand with tradition and artisanal heritage. Finally, it supports premium positioning, helping justify a higher price point in the consumer's mind.

8. "Handcrafted" on a spirits label communicates that the product is made using traditional, small-batch methods with meaningful human involvement rather than automated industrial production. In the premium tequila market, including brands like Teremana, that representation can influence purchasing decisions because consumers often associate it with higher quality, authenticity, and closer oversight.

9. In order to artificially inflate the prices of Teremana products during the Class Period (defined below), Siete misrepresented both the nature of the alcohol contained

2

in Teremana tequila and the methods used in its production, conduct that constitutes unfair and deceptive practices

10. Plaintiff alleges that these representations were material to his purchasing decisions and enabled Siete to charge premium prices. Specifically, the substitution of non-agave-derived ethanol alters the compositional and organoleptic characteristics of tequila, depriving consumers of the distinctive qualities associated with 100% agave tequila, for which they paid a premium.

11. Plaintiff does not challenge any act of the Mexican government, any certification issued by the Consejo Regulador del Tequila ("CRT"), or any determination made under Mexican law. Plaintiff's claims rest entirely on Defendant's conduct as a seller making representations to United States consumers in United States commerce. The Alcohol and Tobacco Tax and Trade Bureau ("TTB") consumer complaint mechanism provides no private right of action, no authority to award damages, no mechanism for class relief, and no enforceable remedy for individual consumers who have suffered economic injury. Federal courts in the Seventh Circuit have consistently held that TTB label approval does not preempt state consumer fraud claims concerning the accuracy of label representations.

12. Plaintiff further alleges that independent scientific testing shows that Teremana products labeled as "100% agave" contain alcohol derived, in material part, from non-agave sources. Plaintiff also alleges that, contrary to representations suggesting small-batch production, Teremana is produced through large-scale industrial operations located in the Mexican state of Jalisco.

3

13. Teremana is sold at various retailers throughout the United States, including major retailers in Illinois.

14. Relying on the allegedly misleading characterization of the product, Plaintiff and the Class Members (defined below) purchased Teremana products and paid a price premium compared to what they would have paid had the true nature and production of the products been fully disclosed.

15. As such, Plaintiff seeks damages, restitution, injunctive relief, and other appropriate relief under state law, on behalf of himself and, as a class representative, on behalf of those similarly situated.

## NATURE OF THE ACTION

16. Plaintiff, ANDREI TOMESCU, on behalf of himself and all similarly situated Class Members, seeks damages, declaratory and permanent injunctive relief, disgorgement of unlawfully obtained monies, attorneys' fees and costs, and such other relief as the Court deems appropriate from Defendant Siete Bucks Spirits LLC, based on claims for unjust enrichment, negligent misrepresentation, and violations of state consumer protection laws, including the Illinois Uniform Deceptive Trade Practices Act.

## PARTIES

17. Plaintiff, Andrei Tomescu ("Tomescu"), is a citizen of Illinois who resides in Cook County, IL and is otherwise *sui juris*.

18. Plaintiff bring this action on his behalf and on behalf of all other persons similarly situated Class Members.

19. Defendant Siete Bucks Spirits, LLC ("Siete"), is a company registered in

4

New York doing business in New York, Illinois, and in every state in the country. Siete owns the tequila brand *Teremana*.

## JURISDICTION AND VENUE

20. This is a national class action, including every purchaser of Teremana tequila in the United States.

21. During the entire Class Period, Siete sold at least 20 million bottles of Teremana Tequila. Out of the 20 million bottles sold, at least 500,000 bottles were sold in Illinois.

22. Siete targets Illinois as it represents a major market for Teremana tequila, with products sold at Costco, Binny's Beverage Depot, Kroger, Walmart, various other grocery stores, and almost every liquor store in the state.

23. The National Class is comprised of at least 1 million people who purchased Teremana during the Class Period.

24. This Court has jurisdiction over this matter under the Class Action Fairness Act, 28 U.S.C. § 1332(d), because this is a proposed class action in which: 1) there are at least 100 class members; 2) the combined claims of Class Members exceed $5,000,000, exclusive of interest, attorneys' fees, and costs; and 3) Defendant and Class Members are citizens of different states.

25. As part of the CAFA action the Court may exercise jurisdiction over over Plaintiff's related state law claims because those claims form part of the same case or controversy as the claims over which this Court has original jurisdiction. Specifically, all of Plaintiff's claims arise from Defendant's uniform course of conduct involving the

marketing, labeling, and sale of Teremana tequila products, and are based on a common nucleus of operative facts. Accordingly, the exercise of supplemental jurisdiction is appropriate.

26.     Venue is proper pursuant to 28 U.S.C. § 1391(b)(2). Plaintiff Tomescu purchased Teremana tequila in this District after being exposed to and relying upon Defendant's misleading labeling and marketing. Defendant marketed, distributed, and sold the products throughout this District, and the challenged representations were displayed to consumers here through product packaging, point-of-sale materials, and other marketing channels. Accordingly, a substantial portion of the conduct at issue occurred in this District.

## TEREMANA TEQUILA

27.     Tequila is a distilled "agave spirit" that is made from the fermented mash of the blue agave plant, with specific requirements for fermentation and distillation, and sold at specified alcohol content levels (generally between 40% and 55% ABV).

28.     Tequila labeled as "100% agave" must be produced using only sugars derived from the Blue Weber agave plant. Products that contain alcohol derived from non-agave sources may not be labeled or marketed as "100% agave."[1] A representation that a product is "100% agave" constitutes an absolute and unqualified claim that the product is composed entirely of agave-derived ingredients, leaving no room for the presence of non-agave substances.

---

[1] Norma Oficial Mexicana NOM-006-SCFI-2012, Bebidas Alcohólicas—Tequila—Especificaciones [Alcoholic Beverages—Tequila—Specifications] (Mex. 2012), available at https://www.dof.gob.mx; 27 C.F.R. § 5.22(g) (2024) (defining tequila as a distinctive product of Mexico produced in compliance with Mexican law).

29.     The "100% agave" designation signals authenticity, purity, and premium quality to consumers.

30.     Consumers are willing to pay a substantial price premium for products bearing this designation and Plaintiff paid a premium for Teremana tequila because of the designation.

31.     The designation is a key differentiator between premium tequilas (100% agave) and lower-priced alternatives (mixto - at least 51% agave) and, as a result, accurate labeling is critical to consumer choice and fair competition.

32.     Siete positions Teremana as a premium product and sells it at prices substantially higher than standard or mixed-sugar tequilas.

33.     On product labels, packaging, and other marketing materials, Siete represents that these Teremana products are made from "100% pure agave" or "100% Blue Weber agave."

34.     These representations are prominently displayed and intended to convey to consumers that the products are produced exclusively from agave plants.



Back Label                                                   Front Label

35.     Siete's "100% puro de agave" representations are uniform across product lines and distribution channels, including retail stores in Illinois and in every other state

36.     Siete knows that consumers associate the "100% agave" designation with higher quality, authenticity, and regulatory compliance.

37.     At the time of purchase, Siete represented on the front label of each bottle of Teremana tequila purchased by Plaintiff that the product was '100% pure agave' and "Agave … 100% Blue Weber Highlands," on the back label. These representations appeared in uniform language, in a prominent font, on the principal display panel of the packaging and were not qualified or limited by any disclaimer.

38.     Siete publicly represents on its official website and marketing materials that Teremana is produced at a single dedicated distillery in the Jalisco Highlands using traditional production methods. For example, Teremana states that it is "crafted in a small town in the Jalisco Highlands of Mexico," and that it is produced through a consistent process involving brick-oven roasting, open-tank fermentation, and copper pot distillation in an single facility bearing the NOM 1613 (Official Mexican Standard). See, e.g., Teremana Tequila, "Our Process," available at https://teremana.com (last visited March 1, 2026).

39.     Each bottle of Teremana sold in the United States bears the distillery identification number "NOM 1613," which identifies the certified tequila-producing facility responsible for manufacturing the product. Reasonable consumers understand the

8

presence of a NOM designation on a tequila label to signify that the product was produced in accordance with legally recognized tequila production standards at the identified distillery. The presence of NOM 1613 on every bottle therefore reinforces Siete's representations that the product is authentic tequila made from 100% agave and produced using the traditional methods described in Siete's marketing materials.

40. Defendant further represents that its tequila is "made the right way," emphasizing uniform sourcing of Blue Weber agave and a vertically integrated production process at its only Highlands distillery. These representations convey to reasonable consumers that all Teremana expressions originate from the same fermentable inputs, fermentation systems, distillation apparatus and bottling facility.

41. At the time of purchase, Siete represented on both the front and back labels that Teremana was produced in "small batch" quantities and on the front label stated that it was handcrafted.

42. Siete relies on these representations to support premium pricing (through an imporession of scarcity) and to differentiate its products from lower-priced alternatives.

43. In an effort to distinguish itself from competitors, Siete also represents to consumers that Teremana is "handcrafted" and "small batch," thereby seeking to further justify the price premium.

44. Teremana representations that it is "handcrafted" and "small batch" to suggest that it is made in small quantities and distilled in a pot still, under constant supervision of a human. "Handcrafted" is defined in Merriam-Webster Dictionary as: "created by a hand process rather than by a machine." In fact, Teremana is made by

9

machines. Teremana is manufactured in a massive distillery located in Jalisco, Mexico, in a small town near Jesús María.

45. Teremana is capable of producing at least 12 million bottles (approximately 2,300,000 gallons of tequila annually) production volumes that are inconsistent with representations of "small batch" manufacturing.

46. There is minimal manual involvement in the production of millions of gallons of alcohol annually. Distilling tequila at a facility producing approximately one million cases per year does not reasonably qualify as "handcrafted," a term typically associated with artisanal fermentation and distillation conducted in comparatively small quantities

47. Teremana operates at a scale hundreds of times larger than, for example, Tequila Ocho, a genuinely small-batch distillery in Mexico that sells in the United States, and many times larger than most tequila producers operating in Mexico, whoch would actually qualify as "small batch" distilleries.

48. And, while Tequila has undeniably gained attention in the spirits market, largely due to the celebrity influence of its founder, Dwayne "The Rock" Johnson, it has not yet reached the level of mainstream recognition enjoyed by Patrón tequila, Jose Cuervo tequila, Don Julio tequila or Tito's vodka. Patron tequila, for example, sells approximately 42 million bottles per year, almost four times more than Teremana.

49. In global and U.S. spirits rankings, Jose Cuervo tequila remains one of the most established and highest-volume tequila brands worldwide, while Patrón tequila is widely recognized as a longstanding premium benchmark with extensive international

distribution. By comparison, although Teremana has experienced rapid growth since its 2020 launch, it is not yet regularly cited among the highest-volume tequila brands worldwide or among the most widely recognized household spirits names.

50. Teremana's prominence in the 100% agave market largely derives from strategic branding, assertions of craftsmanship and small-batch production, and celebrity affiliation, rather than from long-standing market dominance. In contrast to Jose Cuervo, which benefits from decades of brand equity and global scale; Patrón, which established its standing over time as a premium category leader; and a global brand such as Don Julio, Teremana remains relatively smaller in the marketplace, making the "small batch" representation credible for a reasonable consumer.

51. In fact, Teremana emphasizes "small batch" production and traditional methods at its Jalisco Highlands distillery, positioning itself around craftsmanship rather than industrial scale.



Screenshots from https://www.binnys.com (last visited March 3, 2026)

52. Compared to Sauza Silver tequila, Teremana blanco sells for $15.00 more per bottle. That represents a 100.07 % increase in price for Teremana Tequila.

53. Compared to Jose Cuervo Especial, a popular tequila brand that does not claim 100% agave or small batch production, Teramana blanco sells for $11 more per bottle. That represents a 57.90% increase in price for As a direct result of Siete's unfair and misleading advertising, consumers pay at least $11 (57.90%) more for a bottle of Teremana than they would otherwise pay.

54. To evaluate the accuracy of Siete's "100% agave" representations, Plaintiff commissioned independent testing of Teremana tequila products identical with the one he purchased (bearing an identical NOM number and SKU number)

55. The testing employed Carbon-13 Site-Specific Natural Isotope Fractionation Nuclear Magnetic Resonance ("SNIF-NMR") analysis of ethanol, a methodology that, unlike conventional Isotope Ratio Mass Spectrometry ("IRMS"), can detect the addition of cane or maize sugars to products derived from Crassulacean Acid Metabolism ("CAM") plants such as agave.

56. Conventional IRMS measures only the bulk-average 13C/12C ratio across the entire ethanol molecule. Because both agave (a CAM plant) and sugarcane and corn (C4 plants) produce ethanol with overlapping bulk 13C/12C values, IRMS alone cannot reliably detect the addition of cane or maize-derived alcohol to agave-derived tequila, a well-documented limitation of that technique. Until recently, no analytical method, not even isotopic ones, had been able to differentiate between sugars coming from C4-

metabolism plants (cane, maize) and CAM plants such as agave, because in both cases the bulk isotope distributions overlap. By contrast, SNIF-NMR measures the carbon isotope ratio at each specific atomic position within the ethanol molecule, a site-specific approach that provides a unique molecular fingerprint capable of unambiguously distinguishing agave-derived ethanol from cane- or maize-derived ethanol. This methodology has been specifically validated for the authentication of 100% agave tequila and demonstrated to detect adulteration that conventional IRMS cannot.

57.     The Mexican Consejo Regulador del Tequila's ("CRT") on-site inspection methodology, which monitors the production process rather than analyzing the finished product by advanced isotopic methods, is incapable of detecting adulteration introduced through sophisticated blending of CAM- and C4-derived ethanol after fermentation, precisely because the overlapping bulk isotope signatures of these sources render such adulteration invisible to conventional process-monitoring techniques.

58.     The scientific community is in agreement that the CRT's production-line inspection protocol, which relies on process oversight [2] rather than finished-product isotopic analysis, is an outdated verification mechanism that provides no meaningful safeguard against adulteration occurring through the use of pre-processed C4-derived

---

[2]     *See Agave in 2025: Uses, Market, Trends, and Sustainability*, Hegamex, https://en.hegamex.com/post/agave-in-2025-uses-market-trends-and-sustainability (last visited Mar. 29, 2026); *See also Mexico Agave Overproduction Poses a Major Challenge for the Tequila Industry,* Freshly Bottled (2024), https://www.freshlybottled.com/news-2/mexico-agave-overproduction-poses-a-major-challenge-for-the-tequila-industry (last visited Mar. 29, 2026).

ethanol streams blended at the fermentation or distillation stage[3].

59.     SNIF-NMR, by contrast, is recognized as an official authentication method by the International Fruit Juice Union (IFU) and the International Organisation of Vine and Wine (OIV), is accredited under ISO/IEC 17025 by COFRAC (France) and ANAB (United States), and has been described by Eurofins Scientific as a "significant improvement in the state-of-the-art of authenticity testing" specifically because it enables "the first ever discrimination between sugars from CAM plants like agave and C4 plants such as cane and maize." Eurofins Scientific, Authenticity Testing of Agave Syrup (2013).

60.     The testing results for the analyzed Teremana products showed isotope signatures inconsistent with ethanol derived exclusively from agave.

61.     On February 27, 2026, Eurofins Analitics, an accredited laboratory, issued test results in report AR-26-AA-008789-01, affirming  the presence of alcohol derived, at least in part, from non-agave sources in the Teremana Blanco sample provided. Eurofins Analitycs is an ISO/IEC 17025 recognised laboratory specializing in beverage authentication.

62.     Specifically, the adulteration is not borderline. Site-specific carbon isotope analysis by SNIF-NMR shows that authentic agave ethanol has a characteristic internal isotope pattern in which the methylene ($CH_2$) position is more enriched in $^{13}C$ than the methyl ($CH_3$) position, with a larger $CH_2-CH_3$ separation than is observed for cane- or

---

[3] *See* International Organisation of Vine and Wine (OIV), OIV-MA-AS315-23 (Resolution OIV-OENO 553-2016): *SNIF-NMR Method for the Authentication of Spirits*, https://www.oiv.int (last visited Mar. 29, 2026); International Fruit Juice Union (IFU), Method No. 6: *Isotopic Analysis of Fruit Juices and Derivatives*, https://www.ifu-fruitjuice.com (last visited Mar. 29, 2026).

corn-derived ethanol[4]. Here, Eurofins measured $-15.5‰$ at $CH_3$ and $-9.7‰$ at $CH_2$, yielding a $CH_2-CH_3$ separation of approximately $5.8‰$, which is below the agave-characteristic pattern and is therefore consistent with significant (over 10%) dilution by non-agave ethanol from cane or corn sources.

63. In the United States, Eurofins Analytical Laboratories (New Orleans, LA), an ISO/IEC 17025-accredited laboratory accredited by ANAB.

64. These findings contradict Siete's express "100% pure agave" representations.

65. Products containing alcohol derived from non-agave sources may not lawfully or truthfully be marketed as "100% agave."

66. Siete also markets and sells additional expressions of Teremana, including Teremana Reposado and Teremana Añejo. Under standard tequila production methods, both reposado and añejo are produced by aging tequila blanco in oak barrels for defined periods, rather than through any separate fermentation or distillation process. Accordingly, because the underlying tequila blanco used to produce these aged expressions is not derived exclusively from Blue Weber agave, the reposado and añejo varieties likewise are not "100% agave."

---

[4] See Freddy Thomas et al., *Improved Characterization of the Botanical Origin of Sugar by Carbon-13 SNIF-NMR Applied to Ethanol*, 58 J. Agric. & Food Chem. 11580 (2010), https://doi:10.1021/jf102983v; *see also* Vincent Portaluri et al., *Authentication of Agave Products through Isotopic Intramolecular ¹³C Content of Ethanol: Optimization and Validation of 13C Quantitative NMR Methodology*, 1 ACS Food Sci. & Tech. 1095 (2021), https://doi.org/10.1021/acsfoodscitech.1c00177.

67. Beyond Plaintiff's individual testing, the systemic implausibility of industry-wide "100% agave" compliance is confirmed by basic production arithmetic that the Mexican government and the CRT have failed to confront or remedy. According to data compiled by the Consejo Regulador del Tequila (CRT) and the Cámara Nacional de la Industria Tequilera (CNIT), Mexico produced approximately 495.8 million liters of tequila in 2024, consuming an estimated 1.8 million metric tons of agave piñas in the process, an industry record driven by surging global demand. Of the total 2024 production, reports indicate that the vast majority was labeled and marketed as "100% agave," consistent with prior-year data showing that approximately 427 million liters out of 598 million liters produced in 2023 were classified as 100% agave tequila by the CRT.[5,6]

68. A mature Blue Weber agave plant (Agave tequilana var. azul) produces a piña, the harvested core of the plant, typically weighing between 40 and 90 kilograms. Each such piña, when processed through baking, fermentation, and distillation under authentic production methods, yields approximately 3 to 5 liters of finished tequila. Blue Weber agave requires 7 to 10 years of maturation before it can be harvested, a biological constraint that creates an inescapable and verifiable link between current production

---

[5] Tequila Production in Mexico by Type, Statista,, https://www.statista.com/statistics /311737/mexico-s-tequila-production-by-type/ (last visited Mar. 29, 2026).

[6] Consejo Regulador del Tequila (CRT), *CRT Annual Statistics 2024*, https://www.crt.org.mx/ EstadisticasCRTweb/ (last visited Mar. 29, 2026); Tequila Production Volume in Mexico, Statista, https://www.statista.com/statistics/311696/ /mexico-s-tequila-production/ (last visited Mar. 29, 2026); Mexico Is Sitting on 500 Million Liters of Unsold Surplus Tequila, Mexico News Daily (2024), https://mexiconewsdaily.com/business/mexico-500-million-liters-unsold-surplus-tequila/ (last visited Mar. 29, 2026).

volumes and the plantings that occurred years earlier. Farmers plant approximately 2,500 to 3,000 plants per hectare, and the plants cannot be accelerated to maturity without compromising yield and quality.[7]

69.     The agave being harvested for 2024 tequila production was therefore planted approximately between 2014 and 2017. The tequila industry experienced a severe and documented agave shortage crisis during precisely that planting window. The National Chamber of the Tequila Industry reported that only approximately 79.6 million agave plants were available for harvest at the start of 2018, while industry analysts described available supplies as critically insufficient relative to surging global demand for premium tequila.

70.     Farmers were documented harvesting immature four-year-old plants in desperation, further depleting the future supply of properly matured agave available for 2024 and 2025 production[8,]. Separately, before the industry's planting response took hold, some sources reported as few as 29 million agave plants in the ground in 2017, a figure

---

[7] *Blue Agave*, Wikipedia, https://en.wikipedia.org/wiki/Blue_agave (last visited Mar. 29, 2026); Planting, Selection & Harvesting, Academia Patrón, https://www.academiapatron.com/making-tequila/agave-growth-and-harvesting/planting-selection-harvesting (last visited Mar. 29, 2026); The Tequila Boom Creates Excessive Agave Planting, The Indicator from Planet Money, NPR (July 19, 2021), https://www.npr.org/2021/07/19/1018085114/the-tequila-boom-and-agave-bust (last visited Mar. 29, 2026) (noting agave plants yield approximately 3–5 liters of finished tequila).

[8] *The Tequila Boom Creates Excessive Agave Planting, The Indicator from Planet* Money, NPR (2021), https://www.npr.org/transcripts/1018085114 (last visited Mar. 29, 2026); *see also How Agave Shortages Affect Tequila Production in Mexico*, Expert Market Research, https://www.expertmarketresearch.com/featured-articles/mexico-agave-shortage-cycles-and-tequila-production (last visited Mar. 29, 2026).

that, even if disputed, reflects the severity of the supply crisis that preceded current record production volumes.[9]

71.     Even applying the most generous assumptions available: that all 79.6 million harvestable plants at the start of 2018 were devoted exclusively to 100% agave tequila production, that none was diverted to the agave syrup (present, for example, in every Starbucks coffee shop in the world), agave nectar, or other food industries, and that each plant yielded the maximum 5 liters of finished tequila, the total theoretical 100% agave production capacity from that harvest window would have been approximately 398 million liters. That is at least 115 million litters less than Mexico's production in the same period. That mathematical ceiling is fundamentally inconsistent with the production od hundreds of millions more liters simultaneously labeled and sold as "100% agave" or "mixto" across the global market during the same period.

**ECONOMIC INJURY**

72.     Plaintiff and Class Members purchased Siete tequila products in reliance on the "100% agave" representations, as well as the "small batch" and "handcrafted" representations.

73.     Plaintiff and Class members paid a price premium for products marketed as "100% agave."

---

[9] *Mexico's Tequila Shortage Might Be Over Soon*, Fortune (Dec. 7, 2019), https://fortune.com/2019/12/07/mexico-tequila-shortage-agave-plant/; *A Tequila Shortage Could Be on the Horizon*, Fortune (Feb. 1, 2018), https://fortune.com/ 2018/02/01/agave-tequila-shortage/; Cámara Nacional de la Industria Tequilera (CNIT), Industry Reports (2018), https://www.tequila.net/tequila-production-and-export-statistics.html (last visited Mar. 29, 2026).

74. Had the true composition and methods of production of Teremana been disclosed, Plaintiff and Class Members would not have purchased the products or would have paid a lower price for them.

75. Siete possessed superior knowledge regarding the manufacturing and composition and production of its tequila products.

76. Plaintiff alleges that the true nature of the products was not reasonably discoverable by consumers at the time of purchase . Further, the only company able to perform the necessary tests in the United States refused to perform the tests for Plaintiff citing conflict of interest concerns.

77. As a result, any applicable statutes of limitation were tolled until Plaintiff could reasonably discover the alleged misrepresentations.

78. Plaintiff alleges that he did not discover, and could not reasonably have discovered, the alleged misconduct.

## THE PLAINTIFF

79. Andrei Tomescu, purchased one bottle of Teremana (Teremana Blanco), on January 2026, from Binny's Beverage Depot in Skokie, IL believing it to be made from 100% agave, made in a small batch and handcrafted.

80. Upon testing Teramana tequila blanco, Tomescu also realized that Teremana is not 100% agave, and by further investigating into the production methods of Teremana he realized that is not made on a small batch and it is not handcrafted.

81. Indeed, the product Tomescu purchased is industrially manufactured mixed tequila so he didn't purchase a small-batch, high-value spirit, but rather a generic spirit

19

with an overinflated price.

82.     Tomescu  purchased tequila products in the past and intends to continue doing so in the future, including products marketed as "100% agave." Plaintiff would consider purchasing Teremana tequila and other products distributed by Defendant again if they were accurately labeled and marketed.

### 83.     CLASS ALLEGATIONS

84.     Plaintiff incorporates by reference all previous paragraphs of this Complaint as if fully re-written herein.

85.     Plaintiff asserts the counts stated herein as class action claims pursuant to Fed. R. Civ. P. 23.

86.     Plaintiff brings this action on behalf of all persons who purchased Teremana tequila in the United States from its initial commercial distribution in the United States in or about March 2020 through the present (the "Class Period")."

87.     Plaintiff Tomescu seeks to represent three classes composed of and defined as follows:

a.      Nationwide Class: All consumers that purchased Teremana tequila in the United States.

b.      Illinois Subclass: All Illinois residents that that purchased Teremana tequila.

c.      Multi-State Subclass: All residents of the following states that purchased Teremana Tequila during the class period: Colorado, Connecticut, Delaware, District of Columbia, Hawaii, Idaho, Illinois, Iowa, Kansas, Louisiana, Michigan, Minnesota, Montana, Nebraska, Nevada, New Hampshire, New Jersey, New Mexico, New York,

20

Oklahoma, South Carolina, Tennessee, Vermont, Washington, and Wisconsin. The consumer protection statutes of these states are materially identical with Illinois statute. The respective statutes are: COLO. REV. STAT. § 6-1-102; CONN. GEN. STAT. § 42-110a; DEL. CODE ANN. tit. 6, § 2511; D.C. CODE ANN. § 28-3901; HAW. REV. STAT. § 480-1; IDAHO CODE § 48-603; 815 ILL. COMP. STAT. 510/1 (2024); IOWA CODE § 714.16; KAN. STAT. ANN. § 50-623 (2024); LA. STAT. ANN. § 51:1401 (2024); MICH. COMP. LAWS § 445.903; MINN. STAT. § 325F.69; MONT. CODE ANN. § 30-14-101; NEB. REV. STAT. § 59-1601 (2024); NEV. REV. STAT. ANN. § 598.0903 (2024); N.H. REV. STAT. ANN. § 358-A:2 (2024); N.J. REV. STAT. § 56:8-2 (2024); N.M. STAT. ANN. § 57-12-2 (2024); N.Y. GEN. BUS. LAW § 349 (2024); OKLA. STAT. tit. 15, § 751 (2024); S.C. CODE ANN. § 39-5-10; TENN. CODE ANN. § 47-18-104 (2024); VT. STAT. ANN. tit. 9, § 2453 (2024); WASH. REV. CODE § 19.86.010 (2024); WIS. STAT. § 100.18 (2024).

88.	Collectively the members of the Nationwide Class and the Subclasses shall be referred to as "Class Members".

89.	The classes exclude counsel representing the class, governmental entities, Defendant, any entity in which Defendant has a controlling interest, Defendant's officers, directors, affiliates, legal representatives, employees, co-conspirators, successors, subsidiaries, and assigns, any judicial officer presiding over this matter, the members of their immediate families and judicial staff, and any individual whose interests are antagonistic to other putative class members.

90.	Plaintiff reserves the right to amend or modify the class descriptions with

21

greater particularity or further division into subclasses or limitation to particular issues.

91. This action has been brought and may properly be maintained as a class action under Federal Rule of Civil Procedure 23(b)(2) and 23(b)(3) because it is a well-defined community of interest in the litigation and the class is readily and easily ascertainable.

92. Numerosity: At least one million consumers have been injured by Defendant's deceptive marketing practices, including Plaintiff. At least one million consumers have purchased Teremana tequila products and paid a premium for it in reliance on the Defendant's representations.

93. Each of the classes represented by Tomescu have at least one million members and the joinder of all members is impracticable.

94. Typicality: Plaintiff's story and his claims are typical for the class and, as the named Plaintiff, he is aware of other persons in the same situation. Plaintiff and the members of each class sustained damages arising out of Defendant's illegal course of business.

95. Commonality: Since the whole class purchased Teremana tequila products and such products are promoted by Defendant, the questions of law and fact are common to each class. These questions are capable of resolution through common evidence, including Defendant's uniform labeling, marketing materials, production practices, and scientific analysis of the product's composition.

96. Adequacy: Tomescu will fairly and adequately protect the interests of each Class he seeks to represent. Plaintiff is represented by Class Counsel experienced in

22

prosecuting complex class actions and consumer protection matters, including cases involving alleged misrepresentations on alcohol labeling, and who will fairly and adequately represent the interests of the proposed classes.

97. Superiority: A class action is superior to other available methods for the fair and efficient adjudication of this controversy pursuant to Rule 23(b)(3) because:

1) The damages suffered by individual Class Members are relatively small, making individual litigation impracticable;

2) There are no significant individualized issues that would make class treatment unmanageable;

3) Class treatment will conserve judicial resources and promote consistent adjudication;

4) Defendant's conduct is uniform and applies equally to all Class Members

5) Plaintiff's claims do not require individualized proof of reliance because Defendant's misrepresentations were uniform and material to reasonable consumers.

## COUNT I: VIOLATIONS OF THE ILLINOIS CONSUMER FRAUD AND DECEPTIVE TRADE PRACTICES ACT
### (On behalf of Plaintiff Tomescu and Illinois Subclass)

98. Plaintiff incorporates by reference paragraphs 1-97 of this Complaint as if fully re-written herein. Tomescu asserts this count on his own behalf and on behalf of the Illinois Subclass, as defined above, pursuant to Fed. R. Civ. P. 23.

99. The Illinois Consumer Fraud and Deceptive Business Practices Act ("ICFA"), 815 ILCS §§ 505/1, et seq., provides protection to consumers by mandating fair competition in commercial markets for goods and services.

23

100.     The ICFA prohibits any deceptive, unlawful, unfair, or fraudulent business acts or practices including using deception, fraud, false pretenses, false promises, false advertising, misrepresentation, or the concealment, suppression, or omission of any material fact, or the use or employment of any practice described in Section 2 of the "Uniform Deceptive Trade Practices Act". 815 ILCS § 505/2.

101.     The ICFA applies to Defendant's acts as described herein because it applies to transactions involving the sale of goods or services to consumers.

102.     Defendant is a "person" as defined by section 505/1(c) of the ICFA.

103.     At all relevant times, Defendant was engaged in trade or commerce within the meaning of ICFA through the marketing, labeling, distribution, and sale of Teremana tequila products in Illinois

104.     Teremana tequila constitutes "merchandise" under the meaning of section 505/1(b) and its sale is within the meaning of "trade" or "commerce" under the ICFA.

105.     Plaintiff and each member of the Illinois Subclass are "consumers" as defined by section 505/1(e) of the ICFA.

106.     Defendant represented on the principal display panel and back label of Teremana tequila bottles sold in Illinois that the products were made from "100% Agave" and/or "100% Blue Weber Agave." These representations were uniform, prominent, and unqualified.

107.     Defendant further represented on product labels and marketing materials that Teremana was produced in "small batch" quantities and was "handcrafted."

108.     These representations were material because reasonable consumers attach

24

value to tequila labeled as "100% agave," which denotes that the ethanol is derived exclusively from Blue Weber agave sugars and not from non-agave fermentable sources.

109. During the Class Period, Plaintiff purchased Teremana tequila in Illinois after reviewing the product's labeling and representations, including the "100% agave," "small batch," and "handcrafted" claims.

110. Plaintiff relied on these representations in deciding to purchase Teremana and in paying the price charged for the product.

111. Plaintiff retained an independent laboratory to analyze bottles of Teremana tequila identical in product type to those he purchased. The laboratory performed carbon isotope ratio analysis and nuclear magnetic resonance testing, methodologies commonly used in beverage authentication to determine botanical origin of ethanol.

112. The testing results demonstrated isotope signatures inconsistent with ethanol derived exclusively from Blue Weber agave and consistent with the presence of ethanol derived, at least in part, from non-agave sources.

113. Defendant knew or should have known the source of fermentable sugars used in the production of its tequila products. Siete, as the brand owner and sole U.S. importer of Teremana tequila, controlled and approved the production specifications, fermentation inputs, and distillation processes at the NOM 1613 facility. The introduction of C4-derived ethanol into a product marketed as "100% agave" could not occur without the knowledge or deliberate direction of the entity exercising control over production.

114. Furthermore, the SNIF-NMR methodology for detecting adulteration in

agave spirits has been published in peer-reviewed scientific literature and is known to members of the tequila industry and trade. Any importer marketing a product as "100% agave" at premium prices to millions of consumers bears a duty to verify the truth of that representation and Siete had exclusive control over the information necessary to do so.

115. Defendant's failure to verify, or its decision to proceed despite knowledge of the true composition, constitutes at minimum reckless disregard for the accuracy of its representations.Defendant's misrepresentations and omissions regarding the true origin of the alcohol in Teremana tequila, and the methods of production are likely to mislead reasonable consumers acting under the circumstances and, therefore deceptive and unfair acts and practices prohibited by ICFA.

116. As a direct and proximate result of Defendant's deceptive acts and practices, Plaintiff and members of the Illinois Subclass suffered actual damages in that they paid a price premium for Teremana that they would not have paid, or would have paid less for, had the true characteristics of the product been disclosed.

117. Defendant also violated section 510/2(a)(5) of the DTPA by representing that Teremana has characteristics and ingredients that it does not have.

118. The value of the loss, calculated as the price paid for a bottle of Teremana product less the value of the tequila is in excess of $5,000,000 for the entire Illinois Subclass.

119. Defendant's conduct was unfair in that it offends public policy favoring truthful labeling, is immoral or unscrupulous, and causes substantial injury to consumers that they could not reasonably avoid.

120. Plaintiff and the Illinois Subclass seek actual damages, injunctive relief, attorneys' fees, and such other relief as permitted by ICFA

### COUNT II: VIOLATIONS OF THE ILLINOIS UNIFORM DECEPTIVE TRADE PRACTICES ACT
### (On behalf of Plaintiff Tomescu and Illinois Subclass)

121. Plaintiff incorporates by reference paragraphs 1-97 of this Complaint as if fully re-written herein. Tomescu asserts this count on his own behalf and on behalf of the Illinois Subclass, as defined above.

122. At all times relevant hereto, there was in full force and effect the Illinois Uniform Deceptive Practices Act, 815 ILCS 510/1, et seq. ("DTPA").

123. Furthermore, Defendant represents that Teremana tequila has characteristics and ingredients that it does not have.

124. Defendant advertises Teremana with the intent not to sell it as advertised by using the false and misleading advertising and marketing detailed above.

125. Defendant's false and misleading statements set forth above were made knowingly and intentionally, with the intent to mislead the named Plaintiff and the Class.

126. Accordingly, Defendant has violated the DTPA.

127. As such, Plaintiff cannot rely on Defendant's current representations regarding the nature, composition, and method of production of its tequila products.

128. Without injunctive relief requiring Defendant to provide truthful and non-misleading disclosures, Plaintiff faces a real and immediate risk of being misled in future purchasing decisions and of paying a price that does not reflect the true characteristics of the product. Accurate labeling is essential to Plaintiff's ability to make informed

27

purchasing decisions.

129. Accordingly, injunctive relief is necessary to prevent future harm to Plaintiff and the Class.

### COUNT III: VIOLATIONS OF CONSUMER PROTECTION LAWS OF VARIOUS STATES
**(On behalf of Plaintiff Tomescu and the Multi-State Subclass)**

130. Plaintiff incorporates by reference paragraphs 1-97 of this Complaint as if fully re-written herein. Plaintiff asserts this count on his own behalf and on behalf of the Multi-State Subclass, as defined above.

131. The consumer protection statutes enacted in the states included in the Multi-State Class are materially identical to ICFA and DTPA.

132. As such, the members of the Multi-State Class are entitled to damages as calculated by each consumer protection statute in the state where they reside.

### COUNT IV: UNJUST ENRICHMENT
**(On behalf of Tomescu and the Nationwide Class)**

133. Plaintiff incorporates by reference paragraphs 1-97 of this Complaint as if fully rewritten herein. As set forth above, Plaintiff asserts this count on their own behalf and on behalf of all other similarly situated consumers.

134. By paying the high prices demanded by Siete, Plaintiff and Class Members conferred a direct benefit to Defendant.

135. Consumers that are members of the class continue to suffer injuries as a result of the Defendant's behaviors. If Defendant does not compensate Plaintiff, it would be unjustly enriched as a result of its unlawful act or practices.

136. It is an equitable principle that no one should be allowed to profit from his

own wrong, therefore it would be inequitable for the Defendant to retain said benefit, reap unjust enrichment.

137.    Since the Defendant unjustly enriched themselves at the expense of the Consumers, the Plaintiff requests the disgorgement of these ill-gotten gains.

138.    Due to Defendant's conduct, Plaintiff and the Class Members are entitled to damages according to proof.

**COUNT V: NEGLIGENT MISREPRESENTATION**
**(On behalf of Tomescu and the Nationwide Class)**

139.    Plaintiff incorporates by reference all paragraphs 1-97 of this Complaint as if fully rewritten herein. As set forth above, the Plaintiff asserts this count on his own behalf and on behalf of all other similarly situated persons pursuant to Rule 23.

140.    Defendant had a duty to be truthful in its commercial speech. In convincing the Plaintiff to purchase Teremana tequila products, the Defendant made representations that it knew to be false, or negligently failed to examine the veracity of the affirmations.

141.    Defendant's misrepresentations were made with the intent to induce consumers to purchase their tequila products over other tequilas that were not marketed as "100% agave," "small batch," and "handcrafted."

142.    As a result of Defendant's negligent misrepresentations, Plaintiff and the Nationwide Class Members suffered injury.

**COUNT VI: BREACH OF EXPRESS WARRANTY**
**(On behalf of Tomescu and the Ilinois Sub-Class)**

143. Plaintiff incorporates by reference all paragraphs 1-97 of this Complaint as if fully rewritten herein. As set forth above, the Plaintiff asserts this count on his own behalf and on behalf of all other similarly situated persons pursuant to Rule 23.

144. By labeling and marketing Teremana tequila as "100% agave," "100% pure agave," and "100% Blue Weber Highlands" on every bottle label and in all marketing materials throughout the Class Period, Defendant created express warranties that the products were produced exclusively from Blue Weber agave sugars, consistent with the legally recognized "100% agave" tequila standard. The "100% agave" representation constitutes an affirmation of fact relating to the goods, a description of the goods, and/or a promise that became part of the basis of the bargain within the meaning of 810 ILCS 5/2-313.

145. These affirmations of fact and descriptions of the goods were made part of the basis of the bargain between Defendant and Plaintiff and each Class Member, each of whom purchased Teremana tequila in reliance on the "100% agave" representation.

146. Plaintiff and Class Members would not have purchased Teremana, or would not have paid the premium price charged, absent those representations.

147. Defendant breached these express warranties by selling Teremana tequila products that contain alcohol derived, in material part, from non-agave sources, in direct contradiction of the "100% agave" representations made on every bottle label and in all marketing materials. Teremana products do not conform to the affirmations of fact constituting the express warranty.

148. Plaintiff and the members of the Nationwide Class provided, or are excused from providing, pre-suit notice of the breach. Upon information and belief, Defendant had actual knowledge of the nonconformity of its products based on its control over the production process, rendering pre-suit notice superfluous.

149. Defendant had actual knowledge of the product's nonconformity. The incorporation of non-agave-derived ethanol into a product sold as "100% Blue Weber Agave" tequila cannot occur accidentally at industrial scale, it is a deliberate procurement and production decision requiring the sourcing, contracting, and blending of C4-derived alcohol. Formal pre-suit notice would therefore serve no purpose and it is excused.

150. Alternatively, the volume and geographic scope of the transactions at issue make individualized pre-suit notice impracticable.

151. As a direct and proximate result of Defendant's breach of express warranty, Plaintiff and Nationwide Class Members suffered damages in the amount of the price premium paid for Teremana products, as alleged above. Plaintiff and the Nationwide Class are entitled to recover those damages, together with pre-judgment interest, attorneys' fees, and such other relief as the Court deems appropriate.

## DEMAND FOR JURY TRIAL

152. Plaintiff and those similarly situated Class Members demand a trial by jury for all issues so triable.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiff, Andrei Tomescu respectfully requests that judgment be entered in their favor and in favor of the Class Members as follows:

a.  Certifying and maintaining this action as a class action, with the named Plaintiff as designated class representative and with his counsel appointed as class counsel;

b.  Declaring the Defendant in violation of each of the counts set forth above;

c.  Awarding the Plaintiff and those similarly situated compensatory, punitive, and treble damages in excess of $5,500,000;

d.  Awarding the Plaintiff and those similarly situated liquidated damages;

e.  Order the disgorgement of ill-gotten monies;

f.  Awarding each of the named Plaintiff a service award;

g.  Awarding pre-judgment, post-judgment, and statutory interest;

h.  Awarding attorneys' fees and costs;

i.  Awarding such other and further relief as the Court may deem just and proper.

Dated: April 3, 2026                     Respectfully Submitted,

                                         Dagos Boscoianu
                                         Dragos Boscoianu, Esq.
                                         Access Law Group
                                         1480 Renaissance Dr., Suite 308
                                         Park Ridge, IL 60068
                                         Telephone: (312) 880-7279
                                         Email: Drey@AccessLaw.us

                                         *Attorney for the Plaintiff and the
                                         Putative Class Members*

32